The State, *ex rel.* Smith, Attorney-General, *v.* McClelland, Trustee.

Filed June 20, 1894.

———◆———

No. 17,152.

The State, ex rel. Smith, Attorney-General, *v.* McClelland, Trustee, etc.

Constitutional Law.—*Unexpended Balance of School Revenue in Hands of School Corporations.—Act of March 3d, 1893.—Statute Construed.* —The act of March 3d, 1893 (Acts 1893, pp. 195–6), providing "that any school corporation not expending the sum total of the tuition revenue apportioned to it by the State, shall, on the first Monday in July annually, report to and return to the county treasurer of the county in which said school corporation is situated, the unexpended balance of tuition revenue from said source in excess of $100, and the county auditor of said county shall include all such unexpended balances in his report to the State Superintendent of Public Instruction, as revenue collected in his county and ready for distribution at the next apportionment," and providing a penalty, is constitutional and valid.

Same.—*Validity of Act.—Scope of Consideration.*—With the justice, the propriety, the policy, the advisability or desirability of a statute, the courts can have nothing whatever to do, so long as the act does not infringe some provision of the constitution, State or Federal, or some valid treaty or law of Congress.

Common Schools.—*School Revenue.—Distribution.—Control and Title Remain in the State.—School Corporations Agents of the State.*—The distribution of school revenue to the school corporations of the State does not change the title or ownership of the money. The persons to whom the money is entrusted, and to whom it is delivered, hold it as the agents of the State, and the State does not lose its control over it until it is paid out for tuition purposes.

Parties.—*Plaintiff.—State, ex rel. Attorney-General.—School Revenue. —Unexpended Balance.—Township Trustee.—Action.*—An action to recover the unexpended balance of tuition revenue, in excess of $100, in the hands of a township school trustee, which he has neg-

lected or refused to pay over to the county treasurer, is properly brought in the name of the State on the relation of the Attorney-General.

DEMURRER.—*Defect of Parties Defendant.*—*Failure to Designate Proper Parties.*—*Waiver.*—Where a demurrer on the ground of defect of parties defendant does not designate the proper parties, the demurrer is insufficient in form, and the objection is thereby waived.

From the Marion Circuit Court.

*A. G. Smith*, Attorney-General, *A. Zollars* and *L. O. Bailey*, for appellant.

*W. N. Harding, A. R. Hovey, J. Morris, R. C. Bell, J. M. Barrett* and *S. L. Morris*, for appellee.

McCABE, J.—This action was brought by the State of Indiana, on the relation of the attorney-general, for the purpose of recovering a balance of $322.05 of State school revenue for tuition, which was unexpended and in the hands of appellee on the first Monday of July, 1893, left over from the State tuition revenue apportioned to said township for the year ending the day previous, and which it. is stated appellee has refused and neglected, and still refuses and neglects to refund and pay over to the treasurer of Marion county, though often requested so to do. The charge in the complaint was that the tuition revenue received by appellee, from all sources, had been commingled and expended from as an entirety. The suit was commenced under the proviso of the act of March 3d, 1893 (Acts 1893, pp. 195–6). The act is an amendment of section 114 of the school law of 1865, R. S. 1881, section 4482.

The proviso reads as follows: "*Provided, however*, that any school corporation not expending the sum total of the tuition revenue apportioned to it by the State, shall, on the first Monday in July annually, report to and return to the county treasurer of the county in which said school corporation is situated, the unexpended balance of

The State, *ex rel*. Smith, Attorney-General, *v*. McClelland, Trustee.

tuition revenue from said source in excess of $100, and the county auditor of said county shall include all such unexpended balances in his report to the State Superintendent of Public Instruction, as tuition revenue collected in his county and ready for distribution at the next apportionment. Any township school trustee or treasurer of the board of school trustees of incorporated towns and cities refusing or neglecting to refund the said unexpended balance of tuition revenue as herein provided, shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not less than double the amount so withheld.''

The action was begun by filing a petition praying for an alternative writ of mandate to compel the appellee, as trustee of Wayne township, in Marion county, to pay over to the treasurer of said county the sum above mentioned for redistribution by the State Superintendent of Public Instruction. The alternative writ stating the above recited facts was duly issued. The appellee appeared and demurred to the writ on the ground, 1st, that the same showed that appellant, the attorney-general, had no legal capacity to sue; 2d, that there is a defect of parties defendant; 3d, that the writ does not state facts sufficient to constitute a cause of action.

The circuit court sustained the demurrer, to which the appellant excepted, and failing to plead further, the appellee had judgment upon the demurrer.

It is made the duty of the attorney-general, by statute, to institute and prosecute all necessary proceedings for the collection of all moneys where the same is by law required to be paid to the State, or any officer in trust for the State, and in all cases where the officers, whose duty it shall be to collect the same, shall fail, neglect, or refuse, after a cause of action in favor of the State shall have accrued. Elliott's Supp., section 1805.

The State, ex rel. Smith, Attorney-General, v. McClelland, Trustee.

It was held by this court, in *Board, etc.,* v. *State, ex rel.,* 92 Ind. 353, that the attorney-general was the proper relator in a suit to recover moneys belonging to the common school fund of the State. To the same effect are *Board, etc.,* v. *State, ex rel.,* 116 Ind. 329, and *Board, etc.,* v. *State, ex rel.,* 122 Ind. 333.

If, therefore, the unexpended balance of the tuition revenue apportioned for the previous year to Wayne township, in Marion county, by the State, in excess of $100, which the writ states amounts to $322.05, and the truth of which is admitted by the demurrer, belongs to the common school tuition revenue of the State, and a valid law of the State requires the trustee of the township to pay said amount to the treasurer of the county, and he has failed, neglected, or refused to so pay over, the action is properly brought on the relation of the attorney-general. It will be observed that the statute above quoted requires, in such cases, such balances to be returned and paid over to the county treasurer for redistribution by the State Superintendent of Public Instruction, at the next apportionment of school revenue for tuition. The whole question, therefore, depends upon the validity of that statute, not only as to the legal capacity of the attorney-general to prosecute the action as relator, but also as to the sufficiency of the facts to constitute a cause of action.

The other ground of demurrer, namely, that there was a defect of parties defendant, has been waived by the appellee, in so far as he could waive the same, by failing to argue it in his brief. The judgment being in his favor on the demurrer, the presumption that always prevails in favor of the correctness of the action of the trial court on appeal, would, perhaps, require us to uphold the judgment below if any one of the grounds assigned in the demurrer was well taken, whether appellee pointed

The State, *ex rel.* Smith, Attorney-General, *v.* McClelland, Trustee.

out such objection in his brief or not.   But no reason has been suggested why there is a defect of parties defendant in the demurrer, and the law requires such a demurrer to designate the proper parties, and the demurrer failing to so designate such parties, it is insufficient in form.   1 Burns' Rev. 1894, section 342; *Kelley* v. *Love*, 35 Ind. 106.  *Vansickle* v. *Erdelmeyer*, 36 Ind. 262;  *Marks* v. *Indianapolis, etc., R. W. Co.*, 38 Ind. 440.

The demurrer not being sufficient in form, as to defect of parties defendant, the appellee is in the same situation as if he had not demurred for defect of parties defendant at all.   In such case such objection is deemed waived.   1 Burns' Rev. 1894, section 346.

We, therefore, hold that the objection as to defect of parties defendant was waived by the appellee in failing to file a demurrer designating the proper parties defendant.   The only question, therefore, left for our consideration and decision is whether the statute in question is constitutional.   Almost the entire argument, both oral and in the briefs, on both sides, conducted at great length and signalized by much learning and research, spiced with laudable zeal and marred by not a little animosity, has been devoted to that question as the controlling one in the case.   The appellee's counsel have assailed the statute from every standpoint, and have leveled at it many blows that are not constitutional objections.   With such objections to a statute, the courts have nothing whatever to do.   With the justice, the propriety, the policy, the advisability or desirability or undesirability of a statute, the courts can have nothing whatever to do, so long as the act does not infringe some provision of the constitution, State or Federal, or some valid treaty or law of Congress.   Such objections must be made to the Legislature.  *Hedderich* v. *State*, 101 Ind. 564; Cooley's Const. Lim., 201–204.

Nor can the courts inquire into the motives of the Legislature in passing an act in order to overthrow the same. Cooley's Const. Lim., 220–222.

No attempt has been made in that direction, in this case, except that the appellee's counsel has characterized the act in question as "a legislative fraud." But, if we shall find it within the power of the Legislature to pass the act, that ends the inquiry.

The State Legislature possesses all legislative power, except such as has been delegated to Congress and prohibited by the constitution of the United States, to be exercised by the States, and such as are expressly or impliedly withheld by the State constitution from the State Legislature. Cooley's Const. Lim., 104.

The only limitations, therefore, upon the power of the Legislature are those imposed by the State constitution, the Federal constitution, and the treaties and acts of Congress adopted and enacted under it. *Hedderich* v. *State, supra.*

It, therefore, was said in several cases by this court that "the legislative authority of this State is the right to exercise supreme and sovereign power, subject to no restrictions except those imposed by our own constitution, by the Federal constitution, and by the laws and treaties made under it. This is the power under which the Legislature passes all laws." *Beauchamp* v. *State,* 6 Blackf. 299; *Maize* v. *State,* 4 Ind. 342; *Fry* v. *State,* 63 Ind. 552; *Clare* v. *State,* 68 Ind. 17; *McComas* v. *Krug,* 81 Ind. 327; *Campbell* v. *Dwiggins,* 83 Ind. 473.

The sole contention here is that the act is in conflict with the provisions of the constitution of the State.

It was said by this court, in *McComas* v. *Krug, supra,* that "Such questions are always regarded by the courts as of serious importance. The judiciary look to the acts of the Legislature with great respect, and reconcile and

sustain them, if possible. The General Assembly is the immediate exponent of the popular will,—expressly delegated to clothe that will with the forms of law. The presumption that such a body has sanctioned enactments in violation of the constitution, is not to be lightly indulged. That the act is imperfect or impolitic, is not enough. These defects subsequent legislation can remove by amendment or repeal. To bring its validity within the control of the courts, it must be clearly subversive of the constitution."

And, in *Jamieson* v. *Indiana, etc., Gas Co.*, 128 Ind. 555 (568), it was said: "We have no right to presume that the Legislature usurped power, or disregarded the organic law. No precedent will justify such a presumption, nor any reason sustain it. A party who asserts that the Legislature has usurped power, or has violated the constitution, must affirmatively and clearly establish his position. Nor have the courts the right to so construe a statute as to render it void, where a construction that is reasonably admissible will uphold it. * * * We are to resolve doubts in favor of the validity of the statute, without * * stopping to inquire what construction might be warranted by the natural import of the language used."

And, in *Robinson* v. *Schenck*, 102 Ind. 307 (319), this court said: "It devolves upon the party who assails a statute on the ground that it violates the constitution to show a clear violation and to point out the provision violated; failing in this, his attack is unavailing."

It is claimed by the appellee, that the act in question violates the 8th article of the constitution, in that it operates to make an unequal distribution of the school revenue for tuition among the several school corporations of the State according to the number of school

The State, *ex rel.* Smith, Attorney-General, *v.* McClelland, Trustee.

children in each, but what particular section thereof is supposed to be violated, appellee's counsel have not very definitely stated or pointed out. Said article 8 reads as follows:

"*Common Schools.* 1. Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government, it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement, and to provide, by law, for a general and uniform system of common schools, wherein tuition shall be without charge, and equally open to all.

"*Common School Fund.* 2. The common school fund shall consist of the congressional township fund, and the lands belonging thereto; the surplus revenue fund; the saline fund, and the lands belonging thereto; the bank tax fund, and the fund arising from the one hundred and fourteenth section of the charter of the State Bank of Indiana; the fund to be derived from the sale of county seminaries, and the moneys and property heretofore held for such seminaries; from the fines assessed for breaches of the penal laws of the State, and from all forfeitures which may accrue; all lands and other estate which shall escheat to the State for want of heirs or kindred entitled to the inheritance; all lands that have been, or may hereafter be, granted to the State; where no special purpose is expressed in the grant, and the proceeds of the sales thereof, including the proceeds of the sales of the swamp lands granted to the State of Indiana by the act of Congress of the 28th of September, one thousand eight hundred and fifty, after deducting the expense of selecting and draining the same; taxes on the property of corporations, that may be assessed by the General Assembly for common school purposes.

"*Principal, a Perpetual Fund.* 3. The principal of the

common school fund shall remain a perpetual fund, which may be increased, but shall never be diminished; and the income thereof shall be inviolably appropriated to the support of common schools, and to no other purpose whatever.

"*Investment and Distribution.* 4. The General Assembly shall invest, in some safe and profitable manner, all such portions of the common school fund as have not heretofore been intrusted to the several counties; and shall make provision, by law, for the distribution, among the several counties, of the interest thereof.

"*Reinvestment.* 5. If any county shall fail to demand its proportion of such interest for common school purposes, the same shall be reinvested for the benefit of such county.

"*Counties,—Liability.* 6. The several counties shall be held liable for the preservation of so much of the said fund as may be intrusted to them, and for the payment of the annual interest thereon.

"*Trust Funds Inviolate.* 7. All trust funds held by the State shall remain inviolate, and be faithfully and exclusively applied to the purposes for which the trust was created.

"*Superintendent of Public Instruction.* 8. The General Assembly shall provide for the election, by the voters of the State, of a State Superintendent of Public Instruction, who shall hold his office for two years, and whose duties and compensation shall be prescribed by law."

Counsel for appellee point out the fourth and fifth sections of the above article, which they claim are violated by the statute under consideration.

The fourth section only enjoins upon the Legislature the duty to make provision by law for the distribution of the interest of such portions of the common school fund among the several counties as has not theretofore been

The State, *ex rel.* Smith, Attorney-General, *v.* McClelland, Trustee.

intrusted to them. There is no direction how or in what proportions it shall be distributed. Appellee's contention here is that as the money was distributed to Wayne township as tuition revenue according to the number of school children in the township, if the unexpended balance is to be returned to the treasurer for redistribution by the superintendent of public instruction, the equality of distribution which they contend the constitution contemplates will be overthrown and destroyed.

The 5th section simply enjoins the duty on the Legislature in case any county shall fail to demand its proportion of such interest for common school purposes, to reinvest the same for the benefit of such county. There is nothing in that section defining what proportion of such interest such county may demand. Without some other provision it would be difficult, if not impossible, to reach the conclusion that any sort of a distribution provided for by the Legislature would be contrary to the mandate of the constitution.

It is not denied by the appellee's learned counsel, that these two sections were intended to apply to a state of facts that existed at the time of their adoption, but which have long since ceased to exist. We will not stop now to point out those facts. But, notwithstanding, appellee's learned counsel, basing their argument upon those sections, contend that: "The fund in controversy has once been granted under the provisions of the constitution, and the law enacted in conformity thereto, to the use of the schools of Wayne township; and can not be diverted, directly or indirectly, to any purpose other than that for which it has been granted." But the sections of the constitution relied on to support this contention do not aid it a particle, even if they were applicable to a State of facts existing at the present time; because if they are to be construed as vesting title in and

to the common school tuition revenue to be distributed in the one case, and reinvested in the other, they make no provision whatever in favor of the township, but direct a distribution of such interest to the county in the one case, and a reinvestment thereof for the benefit of such county in the other. If these sections operate as a grant of title to such tuition revenue, it is not in favor of the township, but in favor of the county. The controversy here is not between the State on the one side, and the county on the other, but it is between the State on the one side and the township on the other, so far as the claim of title to the money is concerned. That is, the township trustee, though sued to enforce the performance of an official duty on his part, seeks to defend on the ground that the title in and to the unexpended balance of tuition revenue in his hands had been vested in the school township by the constitution and laws, and hence, that the act in question was void as a violation of the constitutional provisions above referred to. The county is not a school corporation, and as such has no title to any of the school tuition revenue, though the county is, and may be used in its civil corporate capacity as an instrumentality in carrying into effect various provisions of the common school system. Therefore, if those sections of the 8th article of the constitution, *supra*, were even held applicable to the state of facts now existing, and to have the effect of vesting title in certain portions of the school revenue for tuition, it can afford no aid to appellee's contention, because he is not basing his defense on the right and title in the county to hold the money, but is basing it on the right and title of the school township, vested in it by these two sections of the constitution; and yet said sections make no grant to, and vest no title in, the township, of school revenue for tuition or anything else; if they vest title

The State, *ex rel.* Smith, Attorney-General, *v.* McClelland, Trustee.

by grant or otherwise in such revenues, they vest it in the county, and not the township. And this being a suit to compel the township trustee, in obedience to the statute in question, to return to the county treasurer the unexpended balance of such revenue, the appellee's contention militates against him, because it would establish that the statute in question only requires him to return such balance to the proper custodian, the treasurer of its owner, the county. Thus his contention would result in wiping out every shadow of a claim that the statute is unconstitutional on the ground that it operates to divest title or ownership in such revenues, and confers them on others. Therefore, in citing those sections of the constitution as the basis of his assault upon the validity of the statute in question, he has failed to comply with the rule that requires one making such an assault, on the ground that the statute violates the constitution, to show a clear violation, and to point out, or put his finger upon, the provision which, either expressly, or by fair implication, necessarily inhibits such legislation. *Robinson* v. *Schenck, supra.*

Appellee's counsel say that it violates the constitution, in that it operates to make an unequal distribution of school revenue for tuition among the several school corporations of the State according to the number of children in each within the school age. They contend that the constitution requires such equality as nearly as it can be practically attained; and that when such a distribution has once been made, the failure to expend all of such revenue during the school year for tuition can give no right to other school corporations to share in such balance without destroying the equality of distribution required by the 8th article of the constitution.

On the other hand, appellant's counsel contend that that article does not require absolute and actual equality

of distribution of the State school revenue for tuition. And in support of that contention they cite *Quick* v. *White Water Tp.*, 7 Ind. 570, and *Quick* v. *Springfield Tp.*, 7 Ind. 636; in both of these cases, it is held that it is competent and constitutional for the Legislature to authorize an unequal distribution of the State school revenue to the various school corporations in the inverse ratio of the amount of tuition revenue possessed by each school corporation derived from the income of the permanent congressional township fund, so as to make the distribution of school revenue from all sources when combined in each, equal according to the number of school children in each. It will be borne in mind that the congressional township fund, owned by the various congressional townships, is very unequal in amount, and consequently the school revenue derived therefrom is also very unequal in amounts among the several congressional townships. It must also be borne in mind that while the constitution makes the congressional township fund and lands belonging thereto a part of the permanent school fund of the State, yet it is settled law that neither that fund nor the school revenue derived from the income thereof can be diverted from the inhabitants of the congressional townships to whom the Congress of the United States granted the sixteenth section in said several townships for the support of common schools therein. *State* v. *Springfield Tp., etc.*, 6 Ind. 83.

It, therefore, became necessary to provide by statute for as great inequality in the distribution of the State school revenue for tuition to carry out what was supposed to be the purpose of the framers of the constitution to afford equal opportunities to all the school children of the State. Hence the decisions above referred to in 7 Ind., *supra*.

The State, *ex rel.* Smith, Attorney-General, *v.* McClelland, Trustee.

Counsel on both sides claim that those two decisions support their respective contentions, namely, on the one hand that the constitution requires an equal distribution of the tuition revenue as a whole, and, on the other, that the State tuition revenue may be unequally distributed without a violation of the constitution. Both contentions are consistent with those cases, but that does not quite meet the question in this case. Both sides concede that the State tuition revenue may be constitutionally divided unequally among the several school corporations of the State, and both virtually concede that such division must be so made as to overcome the existing inequalities in amount of school tuition revenue among the several school corporations caused by the inequality of the congressional township fund and income therefrom owned and held by said school corporations. But that does not reach quite far enough to settle the dispute here.

That dispute is, whether (after a distribution derived from all sources as nearly equal as it is practically attainable to make among the school corporations of the State, according to the number of school children therein under the rules laid down in the cases in 7 Ind., *supra*) it is competent or constitutional for the Legislature to require an unexpended balance of such revenue to be returned for redistribution, and will such return and redistribution destroy the equality of distribution required by the 8th article of the constitution? This query leads us to inquire what particular section of that article, if any, is it that requires such a distribution of school revenue for tuition as that when made there will be equality according to number of children? Appellee's counsel have pointed out no such provision that they even claim makes such a requirement. They have contented themselves by citing the whole article with all its

The State, *ex rel.* Smith, Attorney-General, *v.* McClelland, Trustee.

sections, and the two cases in 7 Ind., *supra,* in support of that claim. The only section that has the slightest bearing in that direction is section one of that article, which enjoins upon the Legislature the duty "to provide, by law, for a general system of common schools wherein tuition shall be without charge and equally open to all." This is the leading thought, the prime object of the whole article. That is the great end in view in the whole article to be accomplished, and whatever contributes to the accomplishment of that great end is but means to the accomplishment of that leading purpose. *Prima facie,* an equal distribution or division of the school revenue for tuition, according to the number of school children in each school corporation, would tend in that direction, but it may not always do so; it may not always furnish tuition equally open to all. Whenever and wherever it does not, it fails to accomplish the great end and purpose of the great and grand men who were the architects of our almost matchless common school system, and in that event an equal distribution of the school revenue for tuition would become a palpable violation of the first section of the article. If it were food and raiment that were to be provided for the school children, then an equal division of dollars and cents, according to the number of children, might be very plausibly urged as near an approach to equality in food and raiment as could be practically attained. But it is instruction and culture of the mind that form the great object to be attained, the better to fit and prepare the children of the State to discharge the duties and responsibilities of manhood and womanhood and citizenship of this great commonwealth. Nor does the State undertake to give to each child an equal amount of education. That would require a higher power than the State. But the constitution has enjoined upon the Legislature the important and delicate duty of so

The State, *ex rel.* Smith, Attorney-General, *v.* McClelland, Trustee.

framing our school laws as that tuition in our public schools shall be without charge and equally open to all. It is a well known fact in history that this grand system met with bitter opposition in the start, but, as time has proven the beneficent results flowing from it, that opposition has grown year by year weaker, until now there are very few indeed who do not claim to be friends of the system. To that opposition may be ascribed the mistake in the decision of this court in *Greencastle Tp., etc., v. Black*, 5 Ind. 557, wherein it was held that a statute authorizing a local levy of taxes in a township to build and repair schoolhouses, and to raise tuition revenue to continue the schools in the township after the public funds shall have been expended, was repugnant to the constitution and void. And though that decision on that point was not overruled until nearly thirty years afterwards, in *Robinson v. Schenck, supra*, yet so great was the growth in popular favor of the system, that similar statutes were afterwards enacted authorizing such local taxation in aid of the system, and carried into execution without question for nearly twenty years before *Greencastle Tp., etc., v. Black, supra*, was overruled. So that it may now be truly said that the architects of that system "builded wiser than they knew."

It is now the just pride of Indiana that she has a system of free schools from which have gone forth men from humble homes, as well as those from more fortunate surroundings, well equipped and prepared to fill stations of high importance, both of State and Nation; and the learned professions, both in and out of the State, have been furnished with many of their members as a direct product of that system, while knowledge and learning generally diffused throughout the community is the rule and not the exception.

Speaking of this system and the proper construc-

The State, *ex rel.* Smith, Attorney-General, *v.* McClelland, Trustee.

tion of the constitution in relation to it, this court said, in *Robinson* v. *Schenck, supra:* "There can be no doubt as to the purpose of our people regarding common schools; both in the constitution of 1816 and in that of 1851 are written provisions clearly expressing the purpose of the people to build up a great and beneficent system in which tuition shall 'be without charge and equally open to all.' The prime object sought is the creation of a system that shall be efficient and enduring. The best means adapted to this end are to be chosen, and all things that will tend to defeat this great purpose are to be put aside. We should wander far from our path of duty if we should give a meaning to the language of the people that would defeat what we know beyond all doubt was their leading purpose. Courts do not bind the constitution when they give it the effect which the people intended it should have. We know that to hold that there must be for the whole State one law, governing alike populous districts and sparsely inhabited localities, making the same provisions for the one as for the other, would defeat the great purpose of the constitution. * * * The constitution declares in very emphatic terms the duty of the Legislature respecting common schools, and the failure of that body to use all suitable means to build up and maintain the system would unquestionably be a grave breach of duty; but the constitution does not deny the right to the Legislature to select the means of building up and encouraging schools. * * * This provision imperatively enjoins the general duty upon the Legislature, but leaves to them much discretion as to the selection of means for the efficient performance of that duty."

The equal distribution of the State school revenue to the several school corporations of the State, according to the number of school children therein, is a means and

not an end, but the great purpose for which this means may be used is that "tuition shall be without charge and equally open to all" the children of the State.

As before observed, an equal distribution owing to local causes may operate to defeat this great end and leading purpose of the constitution. For instance, here is a township densely populated with twelve schoolhouses in it and enough children belonging to each to make a full school, and as many as can be taught in one school; over in another county is another township with the same extent of territory, but the children are only equal in number to two of the schools in the other township, but they are so scattered over the township that they must have four schoolhouses before they can all attend school. An equal distribution of the school revenue for tuition according to numbers will give to that township one-sixth of the amount that it will give the other township, and to each school in the sparsely populated township it would give just one-half the amount of tuition revenue that it would give to each school in the more densely populated township.

And supposing the teacher's salaries in each of the same quality would be the same, it would result in giving the children in the densely populated township twice as long schools, double the length of schools, and hence double the amount of tuition that it would give in the sparsely populated township. That would not be a compliance with the constitutional injunction that "tuition shall be without charge, and equally open to all." Many other causes of a local character might be mentioned as tending in some instances to make an equal distribution operate the same way; for instance the difference in the salaries paid teachers, parochial schools and other causes.

But should the densely populated township have an

unexpended balance of the amount distributed to it left over at the end of the school year, the statutory requirement that it be returned for redistribution is in strict conformity to the requirement of the constitution that "tuition, etc., shall be equally open to all." The constitutional requirement above mentioned, and a sound public policy have the good fortune in this case to coincide. It is believed that scarcely anything could be more unfavorable to the faithful administration of our common school system than to allow these unexpended balances to accumulate, and pile up in the hands of the township trustees, a constant temptation to dereliction of duty, if not of fraud and peculation. Moreover, so long as these balances are thus suffered to remain in the hands of the township trustees, the school children of the State are wholly deprived of the use of them. Besides, the crying evil which has fastened itself upon our grand school system, namely, the making of padded, fictitious and false enumeration of children, by which the number of children within the school age reported from some localities is said to be almost, if not quite, double the actual number, with a purpose of unduly increasing the amount of school revenue to be distributed to such localities will be greatly frustrated by this statute. If the township trustees are compelled to return unexpended balances, the temptation to make such untrue enumerations will be very much reduced. The writ states, and the demurrer admits, that after deducting $100 from the unexpended balance of the State school revenue for tuition, distributed to appellee as such trustee, there yet remains $322.05 thereof in his hands.

The complaint states a good cause of action, and the method of apportioning such revenues for the purpose of ascertaining the sum to be returned, as set forth in the complaint, is the only correct one which could be

adopted. Any balance on hand must be taken to be made up of what is left of the last preceding apportionment to a trustee. The demurrer, therefore, should have been overruled.

It is a mistake to suppose that a distribution of school revenue to the school corporations of the State changes the title or ownership of the money. The persons to whom the money is entrusted and to whom it is delivered, hold it as the agents of the State, and the State does not lose its control over it until it is paid out for tuition purposes.

We therefore hold that the statute is not unconstitutional. The judgment is reversed, and the cause remanded, with instructions to the court below to overrule the demurrer, and for further proceedings not inconsistent with this opinion.

Filed March 6, 1894; petition for rehearing overruled June 22, 1894.